May it please the Court, my name is Jeff King. I appear on behalf of Plaintiffs' Appellants, Sentence Group, and Coral Group, Inc. In the prior opinion on this case, the Court had instructed to focus on the issue of prejudice. And so, until the Court wishes to discuss something else, my intent is to focus exactly on that issue. There is, in this case, no showing of prejudice for the foundational reason that Plaintiffs' actual profits and losses do not matter to their underlying claims. The District Court and Schell both agree that prejudice exists only if Plaintiffs' actual losses are relevant to Plaintiffs' claims or to Schell's defenses of those claims. And Schell admits on page 70 of the brief that it bears... Now wait, the District Court made a specific finding about the heart of Schell's defenses, I'm paraphrasing, and said about Plaintiffs' earning agreed compensation of $2,000 per month. And if you generate so much per month, it would have no damages? So it does seem to me like the District Court did make a finding on prejudice, although not directly. And I would agree, Your Honor, that it made a finding on prejudice. My initial point will be that it made a finding on prejudice related to the breach of contract claim and not related to any of the fraud or negligence claims. And in that sense... In your pleadings, you say, I've just written this in my scribbled notes, you plead that Schell failed to pay sentences, quote, reasonable, legitimate, and, can't read my writing, necessary expenses to operate. Why does that not make this all... Of course, Schell has its defense, which the District Court talked about, but why isn't that a part of your claim that you've got to do that, or is that somehow out of the case? No, and that would be the breach of contract portion of the claim only. But on that very line that you quote, the remainder of the line is based on a number of factors, the primary one being historic expenses, but a number of other factors, industry standards, best practices, none of which are actual expenses. The entirety of the structure, that's paragraph 7B of the MSO agreement in the operative three sentences, sets up we're going to look at historic expenses, we're going to base your expense payments off those historic expenses, and then you get to do whatever you want to do. If you do great, you do great. If you do badly, you do badly. But we're going to put you at the start based on where we were historically based on our historic expenses. But the contract also specifically provides for an adjustment up or down if actual performance does not comport with historical analysis. And that adjustment in the bottom part of paragraph 7B is based on uncontrollable changes in expenses. If you just do a bad job and your expenses are higher, it doesn't address that. But isn't that the whole gravamen of this complaint? Is you're arguing and you were arguing in the complaint that we had uncontrollable expenses, we were reasonable, we were good business people, we did everything right, and yet our expenses exceeded the historical data that you gave us, Shell, and either you were frauds or something's going on here. And so why isn't it important to get into what those numbers are? With respect, Your Honor, that isn't our claim. And the reason is we've said the analogy I would use is we say that we were a 100-meter runner that was started 150 meters from the finish line. We were given the baseline expenses that set up how much money we would be given. We were told it's based on your historic expenses running the station. They were not. We were told that you can design your entire plan based on, this is the fraud claim, historic profit margin and historic revenue figures, and those were actually incorrect. So we started based millions and millions and millions of dollars in the hole. And our claim is we had the right to start at the starting line, not to start 50 yards back. It doesn't matter how fast we run the race. Our damages are to get us back to the starting line. Because we know how we did as operators. That was on us. If we succeeded, we succeeded. If we failed, we failed. Why shouldn't the district court be allowed to look at the totality? You want to cabin this argument into this one issue. Why shouldn't the district court be allowed to look at the fact that you'd misrepresented, not you personally, but your client, misrepresented who their accountant was, misrepresented Mr. Wall's status in the case. Mr. Wall has now somehow disappeared. He was your accountant. He specifically made a finding that your principal lied and was evasive and dishonest on the stand. Why can't they consider the totality of problem after problem after problem, deceit after deceit after deceit? They can consider the totality, Your Honor. The district court itself specifically said if it weren't for the loss of Nick Anton's computer, the sanction of dismissal would not be the appropriate sanction in this case. That is the pinnacle sanction that tipped this to a sanction of dismissal. And I believe the Hairston case, the court has found that the willfulness must be tied to the prejudice causing dismissal. The bad faith must be tied to the prejudice causing dismissal. And so we have focused on, not exclusively, we have other arguments, but we focused on the issue of Anton's computer because I think even the district court would concede without that issue a sanction of dismissal would be inappropriate. And then it's just a question of finding what lesser sanction would be appropriate under the circumstances. With the deference we give to the district court in these matters and, of course, the standard abuse of discretion, what is your best argument? Because the district court is saying, well, this computer information and so forth is essentially irreplaceable and it is relevant to Shell's defense. What's your best argument that that abuse of discretion that we should not defer to the judgment of the district court? I would, with deference, Your Honor, say that there are two very key arguments. The first and I think best argument is, as the avionics lines of cases show as well, the prejudice must relate to the claim that's being dismissed. And I don't think there's a doubt in this, certainly nothing raised by the district court, that the alleged prejudice does not relate to the fraud claim. So at minimum, plaintiffs should be entitled to try their fraud and negligence claims back to the district court. The second issue I would emphasize is there has to be, as I made it with the Hairston case, a finding of bad faith related to the action that causes dismissal. There would have to be a finding that the plaintiffs, by turning over their outside accountant with his computer for a deposition for as long as it takes, giving that full access to that computer, having that deposition terminated by defendant's counsel, and then filing a sanctions motion instead of actually literally putting the copy of the data they wanted on an external hard drive. That I don't know how, and I think it's clearly erroneous, to find bad faith from actually turning a document over to be viewed as long as they wanted by defense counsel. There are numerous other cases we've quoted in our briefs where spoliation doesn't exist, let alone finding a bad faith spoliation when a party had a chance to examine an item, uncontrovertedly examine an item, before any spoliation would actually have occurred. And as well as I have mentioned a little bit on the fraud claim as well and the breach of contract, the second item that I would bring up in addition to a lack of prejudice based on the merits of the case and the spoliated evidence not being relevant to the merits of the case, is we have to look at whether, to find a prejudice in the Gallagher case, which I know Your Honor, Judge Malloy wrote, find that, quote, in evaluating prejudice, we look to whether an allegedly harmed party took other available means to obtain the requested information. And that was found under an abuse of discretion standard that that was reviewed. In addition to having that September 2006 deposition, where they had the computer for as long as they wanted to find the relevant information, there was follow-up inquiries with Mr. Anton, the outside accountant's attorney. And in those follow-up inquiries, Mr. Anton's attorney said, if you have any questions about our responses, please contact me. Otherwise, I will assume this concludes your need for Mr. Anton in the referenced case. It was October 2006. There was no additional request for any information from Mr. Anton, no request for any of the information that is underlying the spoliation finding, at instance here, until at least 2011. As I recall, discovery had closed. Is that- That's correct. Does that make a difference? I think it makes a difference in the fact that, and I cited a number of cases in the brief, that spoliating, that after discovery closes, if evidence is lost later on and previously that's given access to the defendant of that evidence, spoliation can't occur. That actually would be a, not a premature, but a tardy discovery inquiry. You can't file a motion to compel five years after the close of discovery, and there are a number of cases that find that. Similarly, when you've had that access discovery is closed, you can't spoliate evidence to which access has been given five years later, especially under the circumstances, Your Honors. As you're well aware, this case came up on appeal and a sanctioned dismissal once before. This is a very small operator. For information that was available in 2006 not to be available in 2011 at the close of discovery is honestly not that surprising given the things that happened in the previous five years. And I think that's what the line of cases that talk about no spoliation after the close of discovery are referring to and what they anticipate. With that, Your Honor, I know I've reserved four minutes for my rebuttal, and thank you for your time. Thank you. Morning, Mr. Harris. Morning, Your Honors. Beautiful rainy day in St. Louis, back to winter. Well, it's April. If it pleases the court, again, my name is David Harris, and, of course, I represent the defendant Pelley's Shell Oil Company and Equilon Enterprises. Obviously, we seek affirmance of the district court's order before, because we think the issue on appeal has been dealt with comprehensively by Judge Kayes, who conducted an extensive evidentiary hearing evaluating the plaintiff's principle over a six-hour course of examination live and in person in order to make assessments that led him to conclude that spoliation had taken place not just with respect to the Nick Anton computer, but for four categories of information that were important to Equilon's defense that included the computer. Well, I think there's a factual basis for sanctions. My question is the severity of the sanction. And so why don't I move to that then, Your Honors, if that pleases the court? Why does this warrant a dismissal? Well, I think there are two reasons why. One is there is really no dispute that with respect to the core issue in this case, which is the financial performance of the plaintiff's locations, that this would be important evidence for the defendant to have in order to rebut the claim of the plaintiff. The claim of the plaintiff is expressed in a breach of contract and in a fraud claim and in a negligent misrepresentation claim. But at the bottom of all three of those, because it's a promissory fraud claim, it's a negligent misrepresentation concerning promissory elements because it goes to that paragraph 7B of the party's contract. The parties under paragraph 7B agreed that Shell would reimburse certain, make certain expense payments to the plaintiff. And that the plaintiff said that really was we understood it. We claim that what Shell represented to us is that with that level of expense reimbursement, we would be able to make $2,000 per location, per month, before certain overhead expenses were considered. And so what is represented is first, that's a violation of paragraph 7B of the MSO contract. And I believe that Your Honors have all identified in your questions the salient language that raises that issue. And in the fraud claim, the claim is that I was promised that with this expense reimbursement, that I would be able to cover my expenses and that I would be able to make $2,000 per month, per location. And that underlies both the fraud and the negligent misrepresentation claim. If I recall, it was just typical with lawyers. I did the same thing. Every time you did a different count, you incorporated everything that came before. Exactly. And as I recall, this did too. In fact, it did, Your Honor. And in fact, in the Rule 26 disclosures that were filed at the commencement of the case, the plaintiff's financial records, including their profit and loss, tax returns, all of the standard sort of financial information, was identified by the plaintiff as relevant to all of those causes of action. And so we get into the discovery and we find out that we cannot get a true picture of what the plaintiff's expense portfolio is, particularly with respect to how the plaintiff is accounting for overhead expenses that are not supposed to be part of the profitability analysis. And this really gets somewhat of a technical issue, but it really gets at the core of the alleged fraud and financial breach that the plaintiff's alleged. What we discovered through, and I'll just not get into all of the weeds about this, but essentially what occurred is that all of the revenue and expenses from the operation of these stores, plus overhead expenses, automobile expense, apartments, travel, all kinds of things, were identified and managed by Mr. Anton, who was, call him accountant, call him bookkeeper, whatever he really was, he was the sole source of the information necessary to understand how the plaintiff accounted for their revenue and their expenses. We determined that there was a disconnect between those, because what we found out was that Mr. Barazzi had been reporting to Shell that his expense reimbursements were inadequate. And he invoked paragraph 7B of the contract to ask for an adjustment to his reimbursement, and said, here's my wage and hours for my cashiers that work at these convenience stores. Well, what we found out is what was embedded in those numbers, because they were extremely high, over 2 million bucks to run some convenience stores on an annual basis, is that they were reclassifying. They, being Mr. Anton on his computer, was reclassifying these unpermitted overhead expenses that weren't part of the deal. Cars, apartments, travel, consultant expense, payments to family members, things like that were being reclassified as hourly expenses of the cashiers who worked at the station. So our contention is that the plaintiffs, we believe that evidence would have ultimately had it existed. We believe that it would have allowed us to make the argument and to probe the determination. Of course, we don't have it, so we're not really quite sure what it's going to say. But we believe that the smoke that appeared over the horizon would have led us to find that there was, in fact, a disguising of profits from the stations, and that they were very close to the profitability that had been projected for the locations. And that that core defense is lost. It would be a defense that there was no fraud. It would be a defense that there was no negligence. It would be a defense that there would be no breach of contract. And it's that information that was determined at the evidentiary hearing to be in only two places. It was between the ears of Mr. Anton, or it was on his computer. Well, there's also some rough data someplace in a warehouse, boxes and boxes of rough data. Right, counsel? Yes, absolutely there were, Your Honor. And let me just explain that when we asked Mr. Barazzi at that evidentiary hearing in front of Judge Case, Mr. Barazzi, you have those 200 boxes in the warehouse that you say exist. Can you tell us from, or do you know whether it's capable of determining from those materials how the expenses were all calculated, and do those boxes contain information about the expenses at issue? And Mr. Barazzi admitted that he could not under cross-examination. So while the plaintiff says, oh, there's other sources of information, there's no foundation for them to be able to say with any kind of authority, and that's what Judge Case found, is that there was any basis to believe that those materials would happen. You know, 200 boxes of beer nut receipts are not going to tell me about how the BMW rental expense for Mr. Barazzi was treated on the books and records of the company. I've been assuming, Counsel, that the contract does not define overhead or any of these accounting terms. It does not define the accounting terms. That would be grist for the trial court dispute between the parties as to the nature and scope of what it would be. Was Mr. Anton licensed as a certified public accountant or any kind of accountant, do you know? We could not find that he was licensed in any state, Your Honor. Did you ask him when you deposed him? Yes. What did he say? He said that he was trained as an accountant. That's what he said. Mr. Anton lived in various states, had various positions, and as I'm sure Your Honors are aware, there was a lengthy effort engaged to try to locate him, and we were unable to locate him. Was there a photograph of these boxes in Chicago? Yes, Your Honor. My law clerk told me it looked like just the physical fact of them might be hard to reconstruct. Your Honor, the truth of the matter is, and I'll confess that I did not personally see the boxes, but Ms. Reisner, who is sitting behind me, was sent as a dutiful senior associate to go visit the boxes, and they were soaking wet. They had been damaged. Even Mr. Barazzi admitted they were damaged. And at the end of the day, Your Honor, they wouldn't have been usable for what we were trying to establish. Well, can I ask you, one of the primary arguments your opposing counsel makes is that you had unlimited, unfeathered access to this computer for an unlimited amount of time and that you voluntarily terminated the deposition. And you did have a deposition for at least a whole day. So tell me why that wasn't enough. Let me explain that, Your Honor. When we went down to the deposition, it was to follow up on an earlier deposition that I had taken of Mr. Anton when he had not been able to provide any details about the accounting information and said it was all on his computer. We were not allowed to get the contents of his computer in advance of that deposition. So I sat across the table from Mr. Anton. He had a computer screen in front of him. I had a computer screen in front of him. I brought my expert with me, an accountant, to sit there and help me read it. The way it worked was I would ask a question about the financial records of the companies. Mr. Anton would then decide if he had relevant information on his computer. Then he would select the information from his computer and give me a screenshot. Sometimes it would be blocked off with materials that he determined would be irrelevant to the case or irrelevant to the plaintiff's identification. And then I had to read it on the spot and try to make a determination as to whether I could reasonably ask follow-up questions. This went on for nearly nine hours, Your Honor, as you observed. It took all day. Obviously, we identified many, many, many, many file folders and other screenshots that we wanted copies of. So I did not terminate the deposition. I brought the transcript with me. I adjourned the deposition because the agreement of counsel was that there were a number of categories that I had identified. I hadn't had a chance to read them. They had to be printed out. They couldn't be printed out in the room. And so we sent a letter immediately after the deposition listing 17 items off that had been specifically identified during the course of the deposition and requested counsel to produce it to us. Then we would make a decision about what we would do next. We got a letter back saying we refuse to produce or consider our production complete on a large number of them. Some of these matters, some of these documents exist, but we're not going to produce them because we consider them not to be final, like ledgers, just fundamental financial information. So we did not then stay in mute. We then filed our motion for sanctions. And, of course, the court had its full panoply of sanctions. It could have ordered another deposition or whatever. Discovery had been cut off. We were doing our motions and summary judgment. We were trying to rapidly get this case ready for trial. And so I really do not believe that it's a fair characterization. That I threw in the towel and said I didn't want any more of these financial records when, in fact, we were trying to pursue parallel tracks all at the same time in a very contentious case in order to get ready for trial and get the issues identified and preserved. Let's get back to my question, which is, and Judge Malloy has identified where the district court, ultimately, the district court made very reasoned discovery rulings on everything until it gets to the dismissal ruling, and then it says that's pretty much all. Well, with all this background, then says the computer, the absence of the computer, and Mr. Anton, that was enough within its inherent power to dismiss the case. Why is that reasonable or within the realm of reason that that's a valid basis for dismissal? For two reasons, I think, right off the top of my head, Your Honor. One is because of the importance of the information to the case. It is one of the centerpieces of the case. And as everybody agrees, there needs to be a relationship between the prejudice or the loss of the evidence and the remedy and what the defendant would face. The second thing is the court made finding that this was not an isolated. This did not stand alone. And I believe, as Your Honors alluded to, the court can take into account the fact that the court found that the plaintiff's failure to participate honestly in discovery, and I'm not talking about the attorneys. I'm talking about the plaintiff himself, was ongoing and systemic, was not a single mistake or an isolated event, was so widespread it cannot be mere negligence. And there was a discernible pattern depriving Equalan of access to this information. Well, I know all that, but his ruling on the dismissal was very short. And he says consistently evasive and deceptive. And then he says culminated with a loss of irreplaceable information on Anton's computer that the defendant, I'm skipping over this, cannot receive a fair trial. Well, you know, what's the basis for that? And is that truly sufficient for a dismissal? Well, I think it is sufficient for the dismissal, and I think it's taking the totality of the opinion in context. I guess Judge Kayes, in hindsight, could have ---- Poisson says his bad faith cannot be cured with a lesser sanction. Right. So there were two sentences there on the dismissal, and I want you to defend that if you can. Yeah, absolutely, Your Honor. And that's one thing I would say. It's the conclusion from his 34 pages of analysis about what transpired in this case and the irreplaceability of the evidence. He made detailed findings about the fact that every alternative source of information the plaintiffs kept pointing to and Mr. Barazzi tried to testify about at trial just wasn't available and evident. I think the other thing was is the problem, we were going to have a trial. We don't have the evidence to rebut a witness who demonstrated he's willing to stretch the truth. And he's going to say just about anything on the stand to try to persuade a jury that ---- Who are you talking about? This is Barazzi? Mr. Barazzi, who is ---- Barazzi? Yes, sir. And he was their designated representative. He's the guy who says I had all these conversations. He's their key witness on this particular point. And my ability to deal with his claim to jump up there and say I want, I think it's $12 million because I didn't get full reimbursement from Shell for expenses. And then to say, well, maybe my computer got lost, but I think I might have had evidence over here. At the hearing itself, he repeatedly would say, for example, I confronted him with the fact that he had signed sworn interrogatory answers saying Nick Anton was only paid $46,000. I showed him because we had to go to banks and subpoena this information and to credit card companies to subpoena information. I said, you paid a $40,000 credit card bill. Oh, I had forgotten about that. And you know what? That reminds me. I think all the financial information is on a set of computers that Mr. Anton bought for the stores. Where did that come from? Never been disclosed in interrogatory answers or in any other place. And I see my time's up, Your Honor. I could talk for days about this. Obviously, we appreciate the indulgence of the court and would appreciate the affirmance. Thank you. King, you have four minutes. Thank you, Your Honor. I'd like to take some of that time to address the question that I just addressed to Mr. Harris, which is that one paragraph, those two sentences, why is this sufficient in your mind not sufficient for dismissal? I think it's not sufficient for the reason I think you started the questioning, Mr. Harris, with. We can't evaluate this based on, after the close of discovery, what information we have now, but what information they had access to during discovery. And the access was full and complete. I heard Mr. Harris's comment. They had an accounting expert there, a computer there. Why didn't they just download the information they wanted on an external hard drive? We had an accountant. They had an accountant that had the expertise to do that. I thought your witness, Anton, controlled the screen, right? So they can control what goes to the other computer, right? I can almost do that, so surely Anton can. Well, when they were moving between items outside of this issue and they could see other clients, but certainly I know that Mr. Harris that was at the deposition made a couple of comments reminding him to cover the screen, saying it was all right to do it that way because that got us to the information we wanted about this client and about this case, and certainly in downloading information. I'm no computer expert, but it's very easy. You put in an external hard drive to download all the files about a certain subject matter. I didn't think they'd let them do that. Certainly. I was at the deposition personally. Any information that they wanted from the computer. Including the payroll ledger? I thought they asked that with their questions later and they didn't get it. In other words, after the deposition they sent you a letter with, I don't remember how many, 17 questions or whatever, and then you didn't give it all to them. You gave excuses about, and I am not saying the excuses were bad, I'm just saying they didn't get it all. They sent the letter to Anton's counsel, not myself, and in responding Anton's counsel went through and said this is what we've produced before. He denied most of the requests, the letter of October 27th, right? What was that, I'm sorry? He denied most of the requests, the letter of October 27th, right? That would be correct. And Anton's counsel was making the relevancy determination, not you. That is correct. We did not make that relevancy determination, but Anton's counsel as well offered, if you want anything else let us know. There was no request for a follow-up deposition. No request for any additional information. Let's assume a lesser sanction was you can put in no financial information about the performance of your stations, period. What would be left of the case? What would be left of the case is I would say the entirety of the fraud and breach of contract argument because our fraud argument is based on fraud in the inducement, not fraud in the future promise. It's put us to the position we would have been in if those historic past promises were true. And even if there was an adverse instruction to the jury saying you were to assume that plaintiffs didn't lose any money in this, it would not impact that claim because all we want to do is be placed where we should have been in October of 2003 to start. What do you do if you're a district judge and you've got a guy on the stand who has just repeatedly lied? If, and I'm not going to make Mr. Harris' case for him, but I am guessing he will have a very good time impeaching Mr. Barazzi on the stand in front of a jury. I mean, isn't there something integral to the whole process where your designated representative lies and you cannot trust a word he says? There's something integral in the process, and it is one reason, Your Honor, I have not been arguing against no sanction at all, and I'm not going to argue that. But in repeated cases that we have cited, just finding that someone lies is not enough for a sanction of dismissal. You have to find a number of other factors. I don't want to get into this, but I'm going to at least mention it. As a lawyer, you have an obligation not to put on a witness that's going to lie. I mean, you cannot put him on if you know he's going to lie on a material issue. And, Your Honor, I don't believe he did lie, but I'm not here. Credibility arguments are almost impossible. And a lot of inconsistencies. And a district judge found against you. Agreed, but certainly I don't feel I've violated an ethical responsibility by putting someone on that the district judge has a different view of. Okay. Thank you very much. Thank you, Your Honors. Okay. Well, thank you both for your arguments. And this is an unusual case, and we'll do our best to get back to you as soon as we can. Thank you. Thank you. Thank you. Ms. Leisenberg, would you call the next case, please? The next case for argument is Hiles v. United States.